You're prepared, you may proceed. Your Honors, may it please the Court. My name is Peter Zuger, attorney for David Heide. Your Honors, the bankruptcy court's determination to deny David Juve a discharge is not clearly erroneous in this case. Because Juve admitted that he had been living a lie the entire financing relationship, when confronted by David Heide, did not deny stealing his money, but only apologized for it, and engaged in continuous and repeated misrepresentations to obtain extensions and renewals of credit for David Heide. Counsel, how much inference, or how much can you infer from a statement as vague as, one has been living a lie, without context? And perhaps you can supply that to make it more meaningful. Your Honor, the statement, I've been living a lie, came in specific reference to questions from both Dennis Borgen on one occasion, and David Heide on another, in which Dennis Borgen said, what happened to David Heide's money? And David Juve said, I've been living a lie this entire time. I really think that statement is hard to provide context to on appeal. The trial court witnessed the statement, witnessed Mr. Juve admitting to living a lie, and took not only that statement, but other statements he made when he was confronted about what happened to Heide's money, such as the one I just referenced where David Heide said to David Juve, you stole my money. And David Juve said, I'm sorry. He didn't deny stealing the money. He just said, I'm sorry. So what about Mr. Heide's testimony? Now, if you roll through his testimony, and I'm looking at some document 69, you're more familiar with it than I am, pages 79 through 84. If you look at those pages, several times Mr. Heide's asked, at the time a debt gets like to $200,000, were there enough vehicles out there that covered the $200,000? And he says, yeah, I've been very close. And then two or three times, he says similar statements in there. For instance, a final question is, do you have any proof that money went for anything other than the expenses? And he says, I can't speculate. I can't begin to address that. I think that's what the BAP is trying to refer to on page 365 of its opinions, that it just doesn't show when and to what extent they were using the money other than to buy these cars. That, I see, is what the BAP is trying to say, that the record just doesn't support that, except as to Las Vegas. Now, tell me what your view is of that. Well, the fact of the matter is the BAP's opinion really is when it says Mr. Heide couldn't prove where exactly the money went to or when it happened, they're applying a direct evidence standard. They're wanting Mr. Heide to prove exactly where the money went. And the fact is, this was a very well-concealed scheme. It wasn't possible to determine where all the money went. What we do know is it was only supposed to go to buy vehicles. And the absolute admission, everybody agreed it wasn't contradicted that Mr. Juvie did not use the money to purchase vehicles. He used the money for some other purpose. We don't know where it went. Now, it's not just the statements that Mr. Heide made. Mr. Heide wasn't aware when the money disappeared. He always believed there was enough inventory until 2008. We know from Mr. Juvie's own admissions, if you believe his testimony, that by 2006, the inventory had started to become encumbered. Mr. Juvie's statements taken as a whole, not only the admission to living a lie, the statement that he blurted out to Mr. Heide that he didn't gamble the money away, the statement when he didn't deny stealing Mr. Heide's money, all of that coupled with the fact that the Las Vegas auction, his scheme really fell apart at that point. He took David Heide's money. He said he'd purchased six specific vehicles when, in fact, he never actually had. He just took the money and never bought it. The bankruptcy court really did a nice job, in my view, of explaining the importance of that Las Vegas auction. It wasn't just to show that a fraud existed with respect to the last $50,000. The court said it wasn't so much an anomaly, but really just the breaking point in the entire transaction. All those circumstances surrounding how the relationship deteriorated showed that there was a fraud that had long since existed, and, as the court said, probably from the very beginning. But if there wasn't a fraud from the very beginning, the very nature of the financing relationship between Heide and Juvie was one where there was extensions and renewals of credit. Well, the renewals, you said a magic word there because that's in the law. And I noticed throughout your briefs you all talk about this as a revolving account, and I think that's from the record here, revolving account. Is there any case law on when a revolving account is and isn't a renewal? Your Honor, not that I could find. But the fact what, well, if you, there is case law that defines renewal and extension, and I cited that in my brief. The case of, it was Grogan versus, or no, it was Ojeda versus Goldberg, defines extension and renewal. And what the court said there, and in Ray Mark's case that I cited too, and the circuits agree with this, that an extension or renewal within Section 523, if there's forbearance, fraudulent inducement to forbear collection, that's an extension or renewal within Section 523. And the bankruptcy court pointed that out. That's exactly the situation that we have in this case. How so? Well, what had happened was $300,000 of principal was given by 2004. In order to continue the financing relationship, the only way that relationship would continue was when a car was sold, David Heide had to authorize David Juby to buy more cars to extend the credit. If he didn't extend that credit, the cars essentially would have been liquidated, and David Heide would have been able to get his money back. So every time between 2004 and 2008 a car was sold, there was a continuous extension or renewal. And during that time, David Juby admitted numerous times on cross-examination that he said, you're safe, you can trust me, your investment's safe, every car on the lot is your car. You own all the cars on the lot. When, in fact, that wasn't true. Counsel, is there any place here for some diligence on Mr. Heide's part to just ask for titles, proof of ownership, some verification of his interests? No, Your Honor. You're getting to the justifiable reliance element of a Section 523 case. Justifiable reliance really depends on the facts and circumstances of the case. In this case, we had Mr. Heide, who was just a schoolteacher. He wasn't an accomplished business person. He was just a hard worker working at InfoRx. He was working on the same lot, though, right? He was working on the same business. Okay, proceed. Yes, absolutely, Your Honor. Working on the same lot. You knew enough about car purchases that you can prove ownership with a title. Correct, Your Honor. And, in fact, in the record, Mr. Heide talks about that, and he said, you know, around 2006, I asked Mr. Juby if maybe we should keep the titles. Juby kept them at his house. He had a plan to keep them at his house, and he said he kept them in a safe, and he had this plan, and he had this whole excuse about how that was more safe. Is that legal under state law? What state are we in here? It was in North Dakota. It's a Minnesota bankruptcy. It was actually in North Dakota. Right. Is that legal under local law? In Missouri, that's not legal. Did you know that? I didn't know that. I didn't know that. Proceed. No extra charge. Go to your argument. Go ahead. He carefully concealed this. He kept the titles at his house, and the titles would have, in fact, you're right, Your Honor, they would have shown that there was money tied up with a finance company, but the fact is the titles were concealed. And Mr. Heide said, I didn't want to see the titles. It's not good for salespeople to see the titles. And the reason is I don't want to mess that up. That's part of the management part of the business, so I didn't look at the titles. And he had no reason to look at them because, as he testified, I trusted Juby like a brother, he said. He was a friend of mine. He'd visit my mother in the nursing home. He'd stay with my brother-in-law in Las Vegas. There was absolutely no red flags. I could look out and see the cars on the lot, and I could count them myself and tell that there was enough there that my investment was safe. It really came down to the trust that he had in his friend. And he didn't see any red flags and didn't see any reason. Refresh my recollection. The BAP analyzes the evidence on the same basis that the bankruptcy judge does. In other words, they are the finder of fact and judge credibility of the evidence and so forth. They don't have to give any deference to the bankruptcy judge's credibility, determinations, and so forth. Is that correct? That is not correct, Your Honor. The BAP has to review. Actually, the BAP undertakes the same review this court does. It's clearly erroneous. So there's deference given to the bankruptcy court's ability to evaluate the witnesses, to take statements in the context in which they were given, and determine whether people were credible, and to determine how the evidence as a whole should be viewed. Well, the BAP kind of did a whole bunch of that stuff, didn't it, in their analysis of credibility and all that sort of stuff? I completely agree, Your Honor. And there's a very good example of a statement that, in my view, was taken out of context. And as one of the statements said, Mr. Heide admitted that he couldn't get all of his money back at once. Well, that was a statement that the BAP took out of context, and the reason Mr. Heide couldn't get his money back all at once was because of the relationship. They had to sell vehicles to get his money back. The vehicles couldn't all be liquidated at once. That's just not possible. They'd have to sell them off one by one by one until there was enough money. So, yes, it's true he couldn't get his money back all at once, but it's incorrect the way the BAP relied on it. They relied on it as though it was going to be some other arrangement, but the fact was they had to liquidate vehicles. That was the deal. Mr. Juvie knew that was the deal. Mr. Juvie's fraud in this case wasn't just by the outright statements that he made. It was by the omissions in statements. As the financing relationship continued from 2004 to 2008, and he continued to buy cars with David Heide and go to David Heide when an old car was sold and talk about buying a new car, he not only represented that the investment was safe, he failed to tell David Heide that the investment was not safe. He omitted that information. But this has to be fraud, real fraud, not just breach of contract, messing somebody over. It's got to be fraud. On page 365, you're quite correct that the BAP does its own kind of findings of fact, saying that there's nothing in the record to support the bankruptcy court's findings. That's its position throughout that page. How much do you have to show to upset the BAP? How many facts? What level? Put it in terms of this case, not an academic exercise. How much do you have to show? It's a preponderance of the evidence standard, so whether it was more likely than not that a fraud was committed. It's not a clear and convincing standard, and it's not an overwhelming amount of evidence. It's just whether there is a preponderance of the evidence to show that Mr. Juvie engaged in a fraud. And the bankruptcy court specifically said there was an overwhelming preponderance based on what he viewed. There was a lot of facts that supported representations and affirmative misrepresentations in this case. What it really comes down to, Your Honors, is this is a clearly erroneous standard to review. The BAP took one view of the evidence. The bankruptcy court took another. When there's two permissible views of the evidence, the fact finder's choice to take one of those is not clearly erroneous. Two reasonable views of the evidence. Two reasonable views. That's correct. Thank you, Your Honor. I'm into my rebuttal time. I'll reserve the rest for rebuttal. Thank you. Thank you, Mr. Zuger. Mr. Johnson. May it please the Court, David Johnson on behalf of David Juvie. Let me address the living a lie statement first. I believe it was made in 2008 or 2009 at the end of the relationship, if you will, and made to an owner, Dennis Borgen. When I responded to that in my brief, I said it was made to a third party. It was not qualified. It was not quantified. I think what we have to, and the argument here is that he was living a lie during the entire lending relationship with Mr. Heidi. And how can that be? And the reason I make that broad of a statement is you've got testimony from both parties that when this arrangement started out, it was purchase a vehicle. When that vehicle sold, you pay me what I gave you for that vehicle. Plus a small fee, plus my interest, and then if I am the salesman of that car, then also a commission. And both parties testified that when the debt had reached $200,000, that that arrangement had been kept to the letter. That had been complied with by Mr. Juvie to the letter. So how can you be living a lie if the arrangement between the parties has been complied with? Well, no, wait. There's a lie on Las Vegas, right? What is that, Judge? Under the BAP, and you didn't cross appeal, under the BAP's ruling, there was a lie about Las Vegas, the $50,000 Las Vegas. That was a tough one to get around. Well, no, no, no, no. Yeah, I mean, because. No, and this is a yes or no. Yes. So under that. That's right. There's a lie, and that is not cross appealed, right? That's correct. Well, to what extent does that infect the whole case? Well, the BAP found that the Las Vegas transaction, which I think occurred in 2007 or 2008, again, at the end of their relationship, was a separate and distinct transaction. That transaction was to go to Las Vegas and buy six separate cars. And those cars were going to be kept in Las Vegas, and then when the market improved, then they were going to be sold, and then the profits were going to be split between the parties. So it had nothing to do with their original arrangement and nothing to do with the modified arrangement, because remember, under the modified arrangement, what changed is, you know, let's just make it more simple. Just start paying me interest on a monthly basis, which Mr. Juvie did. You know, the fact of the matter is, is we introduced 1099s that were sent to Mr. Heide and to his daughter during trial, and over the course of time, the Heide family, if you will, received $217,000 of interest. Ten percent. Ten percent? Right. Yeah. Ten percent. Ten percent. Right. And again, Mr. Heide, at trial, testified that that arrangement had been kept up with, you know, that it was never a default or it had never missed a beat. Both parties also testified at trial that when the – so I apologize. So from – this arrangement started in 1998. Roughly 2000 or 2001, it changes. Now we go to an interest-only payment. But at that time, the debt is at $200,000. There's another $50,000 borrowed in 2003 and another $50,000 borrowed in 2004. Both parties testified at trial that when the debt had reached $250,000, that there was sufficient collateral or sufficient vehicles to cover that debt. Both parties also testified that when the debt had reached $300,000, that in their mind there was sufficient collateral. Now, Mr. Heide says, I thought there was. Correct. Correct. And to what extent is this case about the weakness of Mr. Heide's testimony and that him being a nice guy? Well, you know – His answers are nice guy answers. Well, and I know Mr. Heide. He and I are about the same age, and he was a very successful high school football coach when I was playing for an opposite team. But let's not forget that he testified that he worked there probably longer than anybody on a daily basis, and he was there six days a week. I asked him if he had access to the business records. He said he did. The court has already acknowledged that he did not take a security interest against any of these vehicles. I asked him during the course of the relationship if he had ever requested a financial statement. He did not. I asked him during the course of the relationship if he had ever requested a tax return. He did not. He was there on a daily basis. He had the ability to go out on the lot and look at the cars that were on the lot, and if he had any questions or any concerns, he could have addressed them at that time. Did Mr. Juvie ever inform Mr. Heide that he had begun encumbering the vehicles? No. Was there any representation that he would do so if he did, or a representation that he would not encumber them or that they were unencumbered? Mr. Juvie says that he, I think his testimony is that he never informed Mr. Heide that the vehicles were unencumbered. And again, you know, maybe the problem with, you know, it's not a problem, but with this case, what's lacking on Mr. Heide's end, if you will, is that you've got two gentlemen that reached an oral agreement. And so they put their first arrangement, you know, it's just oral. They don't put anything in writing. They put the second agreement together, you know, nothing in writing. There's nothing in the record or any testimony by anybody as to when Mr. Heide's principal, you know, was to be repaid. They kept everything, you know, very simple. Well, he did ask him for $10,000 at one time, and he told him no. That's correct. Is that 08? Correct. Well, what about that? He did ask for principal then. He did. But I think what the BAP did, and I think rightfully so, is that you have to look at when the monies, you know, were borrowed, and were there misrepresentations made at the time that those monies were lent to Mr. Juvie? And the uncontroverted testimony at trial is that there were no, you know, misrepresentations. Is it a misrepresentation if you're inquired of if your investment is safe and you're assured it is when objectively it probably isn't? But it was because, again, remember, both parties acknowledged at trial that when the debt had reached $300,000 that at least, I think, you know, Heide said it probably was, but Juvie said yes, there was sufficient collateral on the lot to cover that $300,000 debt. So I believe the BAP's opinion was that that misrepresentation has to occur at the time that you're lending the $50,000 in 2003, the $50,000 in 2004. And that gets me to the argument of this re-extension of credit. There's nothing in the record, and the BAP found so, there's nothing in the record that says that each time, you know, you sell a vehicle, I'm re-extending, you know, credit, and you have an attendant obligation to inform me, you know, whether there's sufficient collateral on the lot to cover that debt. Because, again, there's nothing in writing between the parties to say these are our obligations and these are our duties under this agreement. Counsel, I think that's a little bit phony because they agree about what the real deal was here, don't they? You bet. Yeah, they agree what the real deal was. Now, let me ask you about, even about Las Vegas. I noticed the BAP, I read it carefully, the BAP says that a debtor took the money and knew that they were never going to import motor's lot. You notice it says that? But wasn't the $54,000 check for Las Vegas made out to import motors? Every check was made payable to Imports Plus Inc., a corporation. Doesn't that tie it all together? Yes. Doesn't that tie Las Vegas' fraud into all the other frauds? Well, again, I don't think there was, when you say all the other frauds, I don't think there were other frauds. But, and again, the Las Vegas transaction was not to bring the cars to the Imports Plus Inc. lot and to continue to pay interest payments. It was, I'll go buy these cars, we'll keep them in Las Vegas, and when they sell, we'll split the profits. So it's a separate and distinct transaction between the parties. And that's where the BAP came, I think, with their opinion that we can't tie this to other frauds, if you will, because it's a separate and distinct transaction. And again, both parties testified that they were satisfied up to the point that the $300,000 was borrowed. Now, I'm going to probably give you a wrong page number here, but I'm looking at our appendix, page 219. This is questioning by Mr. Zuger of Mr. Heide. And he goes, the money was written out to Imports Plus for, but he had invested $300,000. Yes. And he gave that money to you, correct? It went, the checks went into your account. Are you on document 69? It's a district court document 69? This would be the transcript? Yes, correct. What page are you on of that? I'm on page 128. Okay, I don't have that one. Go ahead. And he goes, they were in my hand. I deposited them in the Imports Plus account. And then you used that money to purchase vehicles. And Mr. Zuber went, correct. So up to the time that the $300,000 was invested, there's nothing in the record to indicate that there was any fraud, that the money went elsewhere other than being used to purchase vehicles. And quite frankly, there's nothing in the record until like 2006 or 2007 when Mr. Zuber admits at that point that he began to encumber vehicles and that the business at that point started to go south on him. And that if the vehicles were to be liquidated at that time, that there were insufficient vehicles, if you will, considering those encumbrances, to pay back Mr. Heide. Counsel, I understand Mr. Heide's testimony up to $300,000. Is that you asking the questions, by the way? Yes, it was. Okay, good. Anyhow, I understand his testimony. You're very familiar with it. Up to $300,000, and I thought there was enough there for $300,000. What about the last $100,000 from $300,000 up to $400,000? How about that? That's pretty fraudulent, isn't it, at least that much of it? No. What happened there is the other $100,000, $50,000 of it would have come from Mr. and Mrs. Heide's daughter, Kaya. And so Kaya invested $50,000 as well. The testimony at trial was that, again, that check was made payable to Imports Plus Inc., that Mr. Heide gave the check to Mr. Juvie, that at no time did Mr. Juvie have any conversations or discussions with Kaya Heide, and so that there were no misrepresentations made. And so that claim, if you will, was not strenuously argued at trial, if you will, and was basically thrown out. The other $50,000 to get it up to that $400,000 was the Las Vegas transaction. So what we dealt with then on the final judgment, if you will, was a $350,000 judgment. And so that when I appealed to the BAP, I appealed on the basis that that $300,000 should be held. No, I'm sorry. I think when I appealed to the BAP, I was trying to argue that all of it should be held non-dischargeable. And the BAP came back and said, no, we agree with the concept that the $300,000 is dischargeable, but we don't agree as to the $50,000. And as the court acknowledged or recognized. Was the daughter in this case on the $50,000? Is she out? Yeah. Is she making a claim in this case? Is she a party? She did. And we got a little convoluted before we tried the case. But what we ended up doing was, and so the court doesn't forget here, initially, this was before the BAP on two occasions. There was a motion for summary judgment, which was granted. And then I appealed that. And then the BAP reversed and remanded it back. And for two reasons. Whether the bankruptcy court's factual findings were supported by substantial evidence. I'm sorry. Whether the court could pierce the corporate veil. And when were the misrepresentations made. So then what we did is, we entered into a stipulation where judgment was entered against Mr. Heidi. His wife was dismissed. Excuse me, Mr. Juvie, I'm sorry. Mr. Juvie's wife was dismissed from the lawsuit. There were also separate counts related to a full non-discharge in bankruptcy. There were other allegations made under some other non-exception provisions of the bankruptcy code as to why the debt should be held non-dischargeable. Those were all dismissed. And then I think Kaia Heidi's claim was also dropped out of the equation as well. So when we went to trial, all that was left was David Heidi's claim against David Juvie for the $350,000. I notice she's still in the caption, but you say she's not really a party at this point. That's correct. Thank you. That's correct. So, in summary, you know, again, I think the court has to look at the oral arrangement between the parties. Very simple arrangements. Nothing in writing. Very simple in terms of how it's going to be done. The record does not support any findings that there are misrepresentations made at the time that these monies were lent to Mr. Juvie or to his business. Because, again, they were all made payable to Imports Plus Inc. And I don't think I need to go into that as to whether the court should pierce the corporate bail or not. And that, based on the law, this, you know, the BAPS decision was the right decision. Thank you, counsel. Mr. Zucker, you may conclude your argument. Thank you, Your Honors. One important issue, well, there's a lot of important issues, but the Vegas transaction is really important in this case. Because the only difference between that transaction and all the other transactions between 2004 and 2008 is that Mr. Heide actually handed a check over for that one. The previous, between 2004 and 2008, those transactions, there wasn't a check written, but money was still extended.  It was no difference. It's just that Mr. Heide didn't physically write a check for those transactions. Again, the extension of credit was there. That's why this case is not a breach of contract case. Because by 2006, Mr. Juvie admitted that he was encumbering vehicles. Yet, every single year, 2006, 2007, 2008, he told Heide his investment was safe. He told Heide he owned the vehicles on the lot. Yet, he still allowed Heide to extend that money to him. And they talked about buying cars after old ones were sold. The whole relationship was an extension of credit relationship after 2004. But it wasn't just that. This Court brought up the issue with Kaya Heide. She's not part of the case, but it was important, the testimony relating to her. Because Mr. Juvie admitted on cross-examination that he took David Heide's money for Kaya Heide's loans, knowing that David Heide's inventory was encumbered, and knowing that he didn't use Kaya Heide's money to, in fact, purchase vehicles either. So that's kind of another circumstance in the whole bunch of circumstances in this case that shows that there was a fraud, not only from the outset, but definitely between 2004 and 2008. And by Juvie's own admission, from 2006 to 2008, when he was encumbering vehicles, and expressly represented to Mr. Heide that Mr. Heide owned the vehicles and his investment was safe, but continued using Mr. Heide's money. Thank you, Your Honors. Thank you, Counsel. The Court wishes to thank you both for your presence this morning, the argument you've provided, and the briefing. Consider your case submitted. We'll render a decision in due course. Thank you.